**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| A'GACI, L.L.C., | § | Case No. 18-_____ |
| | § | |
| Debtor. | § | |
| | § | |

**DECLARATION OF MARK BUTTERBACH IN SUPPORT OF THE DEBTOR'S**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Mark Butterbach, hereby submit this declaration (this "Declaration") under penalty of perjury:

1.     I am the Chief Financial Officer of A'GACI, L.L.C. ("A'GACI" or the "Debtor"), a limited liability company organized under the laws of the state of Texas and a debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). In such capacity, I am generally familiar with the Debtor's day-to-day operations and financial affairs.

2.     I became involved with A'GACI in January 2017 when I was hired as A'GACI's Chief Financial Officer. I have over 11 years of retail finance experience. My experience includes various management roles at Signet Jewelers, Zale Jewelers, and Abercrombie & Fitch.

3.     On January 9, 2018 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division. In order to allow the Debtor to meet necessary obligations and fulfill its duty as a debtor in possession, the Debtor filed the motions and applications described in this Declaration (collectively, the "First Day Pleadings"). I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to enable the

1

Debtor to operate in Chapter 11 with minimal disruption or loss of productivity and value. I further believe that the relief sought in each First Day Pleading constitutes a critical element in achieving a successful reorganization of the Debtor's business, and best serves the Debtor's estate and creditors' interests.

4.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of A'GACI's business operations, my review of relevant documents, information provided to me or verified by other executives or employees of the Debtor, A'GACI's professional advisors, including Haynes and Boone, LLP ("<u>Haynes and Boone</u>"), and Berkeley Research Group, LLC ("<u>BRG</u>"), and upon my experience in the retail industry generally.   Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change. I was involved with the preparation of the petition and First Day Pleadings.   I am authorized to submit this Declaration on behalf of A'GACI, and if called upon to testify, I would testify competently to the facts set forth herein.

5.      This Declaration is organized into four sections. **Part I** describes A'GACI's business; **Part II** describes A'GACI's capital structure; **Part III** describes the key events that led to the commencement of the Chapter 11 Case; and **Part IV** summarizes the relief requested in, and the legal and factual basis supporting, the First Day Pleadings.

# I. A'GACI'S BUSINESS

## A. History and Formation

6.      Founded in San Antonio, Texas, A'GACI is a fast-fashion retailer of women's apparel and accessories.[1] A'GACI attracts young, fashion-driven consumers through its value-pricing and frequent introductions of new and trendy merchandise.

7.      A'GACI is a privately held Texas limited liability company. The Debtor's sole members are John Won and David Won. The Debtor was originally organized in 2001 as a Texas limited liability company under the name of Twigland Management, LLC. In June 2007, Twigland Management, LLC merged with Twigland Fashions, Ltd., and the company name was changed to Twigland Fashions, LLC. Following the merger, in August 2007, Twigland Fashions, LLC changed its name to A'GACI, L.L.C. Finally, in February 2013, Won Management, LLC merged with A'GACI, L.L.C., resulting in the Debtor as the surviving limited liability company.

## B. The Debtor's Current Business Operations

8.      The Debtor operates specialty apparel and footwear stores under the A'GACI banner as well as a direct-to-consumer business comprised of its e-commerce website www.agacistore.com. Stores feature an assortment of tops, dresses, bottoms, jewelry, and accessories sold primarily under the Debtor's exclusive A'GACI label. In addition, the Debtor sells shoes under its sister brand labels of O'Shoes and Boutique Five. Boutique Five also comprises a portion of apparel and accessory merchandise. Sample looks from the Debtor's past collections are pictured below:

---

[1] The term "fast-fashion" is generally used to describe an approach to the design, creation, and marketing of clothing fashions that emphasizes making fashion trends quickly and cheaply available to consumers. *See Merriam-Webster Online* Dictionary, "fast fashion." http://www.merriam-webster.com (Jan. 4, 2018).



9.     The Debtor continually updates its merchandise and floor sets based on the latest fashion trends. The Debtor's target demographic is confident women who are comfortable with their appearance and enjoy showcasing their look.

10.     The Debtor operates its e-commerce business utilizing the services of an independent third party, Radial, Inc. ("Radial"). Radial is responsible for processing and shipping most of the online sales of the Debtor.  Radial also provides related services, such as customer care and support services with respect to the Debtor's online store.

11.     As of January 1, 2018, the Debtor operated 76 retail stores, not including two stores in Puerto Rico that remain closed as a result of hurricanes during 2017. The Debtor's stores are located in fashion retail venues predominately in Texas, Florida, California, and Illinois. Additionally, third parties operate two A'GACI franchise locations in Venezuela. The Debtor's corporate office is located in San Antonio, Texas. In addition, the Debtor leases office space in Los Angeles, California in which the Debtor conducts merchandising functions, as well as a 283,000 square foot distribution center in Von Ormy, Texas (the "Distribution Center"). The Distribution Center was constructed in 2016 and commenced full time operation in February 2017.

4820-1243-5290

12.    A map of the Debtor's locations is shown below:



A'GACI locations (can be multiple per market)
Corp. HQ    A'GACI Distribution Facility (288,000 sq. ft)

| State | Total |
|---|---|
| Texas | 34 |
| Florida | 12 |
| California | 9 |
| Illinois | 4 |
| Puerto Rico | 4 |
| Arizona | 3 |
| New York | 3 |
| Maryland | 2 |
| Nevada | 2 |
| Tennessee | 2 |
| Hawaii | 1 |
| Minnesota | 1 |
| New Mexico | 1 |
| **Total Stores** | **78** |

13.    To successfully operate its business, the Debtor must ensure that its retail stores are continuously replenished with stock for sale to its customers. The Debtor utilizes Oracle v15 (the "Oracle Retail System") as an enterprise resource planning ("ERP") tool to support merchandising, inventory management, warehousing, distribution, and sales audit functions. After a delayed and problematic implementation period (as described in more detail below), the Oracle Retail System was launched around August 2017.

14.    The Debtor, as a fast-fashion retailer, needs to consistently remain on-trend with the latest fashion. The Debtor tracks fashion and style bloggers and works with trend services that forecast and monitor new trends in the marketplace. Inventory planning begins

5

approximately six months in advance of the applicable season. Most merchandise is purchased from vendors in Los Angeles, California. Generally, denim, footwear, and basics are imported, while the remainder of the goods are cut and sewn domestically. Although the Debtor's vendor base changes over time depending current trends in fashion and availability of goods, many of the Debtor's larger vendor relationships have been in place between five and eight years, with some relationships going back as far as twenty years. The Debtor's relationships with its vendors are crucial to business operations.

15. Typically, the Debtor places orders 4-6 weeks ahead of expected delivery to the Distribution Center. Approximately 50% of purchases are concepts designed solely by vendors; 40% are vendor concepts that the Debtor modifies (for example, by adding a pocket); and 10% are solely designed by the Debtor. A'GACI relies on third parties to ship inventory from vendors to the Distribution Center, and from the Distribution Center to the Debtor's stores. Inventory is typically processed and shipped from the Distribution Center within one to two days of arrival.

16. Both in stores and online, the Debtor utilizes an everyday low price sale methodology. The majority of markdowns are clearance pricing discounts used to clear inventory. To The Debtor turns its inventory almost six times a year, which is typical of a fast fashion retailer. For the year to date period ended November 25, 2017, the Debtor's gross sales were $136,204,241. Of that amount, approximately 9.4% or $12,829,350 was attributable to the Debtor's e-commerce business.

## C. Cost structure

17. The Debtor's cost structure is comprised of certain fixed and variable costs. The Debtor's largest expense categories are cost of goods sold, employee related costs, and costs

associated with the Debtor's real estate leases. Other expenses include, without limitation, warehousing, shipping, advertising, maintenance, supplies, insurance, and other related items.

### i. Cost of Goods Sold

18.     The cost of goods sold for the year to date period ended November 25, 2017 was approximately $65.9 million, resulting in a gross margin of approximately 51.6%. Freight into the Distribution Center is realized in the month incurred and flows through cost of goods sold. Therefore, all associated costs, such as duty and overseas freight, are included in the purchase price.

### ii. Employee-Related Costs

19.     The Debtor currently employs approximately 2,100 individuals. Retail store employees are the largest subgroup, totaling approximately 1,900.  Each of the Debtor's store locations has between 15 and 70 employees, depending on the size and business demands of the location.  Distribution center employees are the second largest group with approximately 160 employees.

20.     The Debtor pays its employees on a bi-weekly cycle. Payroll is processed on Wednesday and covers the two-week period through the prior Saturday.  In addition to wages, the Debtor also contributes to several employee benefit plans providing medical and other ancillary benefits to qualifying employees. For the year to date period ended November 25, 2017, the Debtor's payroll and other benefit obligations for its employees totaled over approximately $31.6 million.

### iii. Lease-Related Expenses

21.     The Debtor leases the Distribution Center, its merchandising office in Los Angeles, California, and all of its store locations.  The Debtor does not own any real property.

Most of the Debtor's store leases have a fixed rental payment due in advance or require the Debtor to pay rent based on specified percentages of sales after the Debtor achieves specified annual sales. For the year to date period ended November 25, 2017, the Debtor's expenses related to occupying its leased premises totaled approximately $27.6 million.

## II.     CAPITAL STRUCTURE[2]

22.     As of November 25, 2017, A'GACI's unaudited balance sheet reflected total assets of approximately $82 million, total liabilities of approximately $62 million, and partners' capital of approximately $20 million. The Debtor's principal assets consist of its accounts receivable, inventory, and fixed assets, including furniture and fixtures, information technology assets, and leasehold improvements.

23.     The Debtor's prepetition debt structure primarily consists of: (i) the First Lien Obligations (defined below); (ii) the Term Loan Obligations (defined below); (iii) the Capital Lease Obligations (defined below); and (iv) unsecured debt consisting of, among other things, amounts owed to vendors and landlords.

### A.     First Lien Credit Facility

24.     A'GACI and JPMorgan Chase Bank, N.A. ("Chase") are parties to a Credit Agreement dated as of January 30, 2015 (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement"). The First Lien Credit Agreement provided for a senior secured revolving credit facility (the "First Lien Credit Facility") in an amount of up to $10 million, subject to certain terms and conditions. Obligations under the First Lien Credit Facility were initially secured by a first priority lien on substantially all of the Debtor's assets. On January 18, 2017, Chase filed a UCC financing statement

---

[2] This summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

amendment with the Texas Secretary of State to effect a partial lien release with respect to the Term Loan Collateral (defined below).

25.     The First Lien Credit Facility is primarily used for general corporate purposes, and in the absence of a default under the First Lien Credit Agreement, would mature on January 30, 2018.[3]

26.     As of the Petition Date, the principal amount of approximately $6.072 million in borrowings was outstanding under the First Lien Credit Facility (the "First Lien Obligations").

**B.     Term Loan Credit Facility**

27.     A'GACI and Bank of America, N.A. ("BoA" and collectively with Chase, the "Prepetition Lenders") are parties to a Loan Agreement, dated as of January 19, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Term Loan Credit Agreement"). The Term Loan Credit Agreement evidences two senior secured term loan facilities (collectively, the "Term Loan Credit Facilities") in the original aggregate principal amount of $5,000,000, subject to certain terms and conditions.

28.     Under the first Term Loan Credit Facility, BoA agreed to provide a term loan to A'GACI in the amount of $3,496,356 with an interest rate of 3.65%. A'GACI agreed to repay principal and interest in equal combined installments of $47,309.53 beginning on February 19, 2017, and on the same day of each month thereafter, with the last payment obligation to occur on January 19, 2024.

29.     Under the second Term Loan Credit Facility, BoA agreed to provide a term loan to A'GACI in the amount of $1,503,644 with an interest rate of 3.5%. A'GACI agreed to repay principal and interest in equal combined installments of $33,646.10 beginning on February 19,

---

[3] Pursuant to the terms of the First Lien Credit Agreement, the First Lien Credit facility could also mature by virtue of the revolving commitment being reduced to zero.

2017, and on the same day of each month thereafter, with the last payment obligation to occur on January 19, 2021.

30. Obligations under the Term Loan Credit Agreement are secured by the Debtor's equipment and fixtures at the Distribution Center (the "Term Loan Collateral"). As of the Petition Date, approximately $4,265,902 in principal amount remained outstanding under the Term Loan Credit Agreement (the "Term Loan Obligations").

## C. Capital Leases

31. The Debtor is a party to certain capital lease arrangements for computer software and related equipment. As of the Petition Date, the Debtor's total capital lease obligations were approximately $800,000 (the "Capital Lease Obligations").

## D. General Unsecured Creditors

32. In addition to the Debtor's outstanding obligations under the First Lien Credit Facility, the Term Loan Credit Facilities, and the Capital Leases, the Debtor also has unsecured debt obligations, including amounts owed to trade vendors and to landlords, among others. As of the Petition Date, the Debtor estimates that general unsecured claims total approximately $61,000,000.

## III. EVENTS LEADING TO BANKRUPTCY AND PREPETITION RESTRUCTURING INITIATIVES

## A. Events Leading to Bankruptcy

33. A'GACI's financial performance has been negatively affected by (i) unsuccessful brick and mortar expansion efforts; (ii) a shift in consumer preference towards online purchases; (iii) difficulties with the implementation of the Oracle Retail System; and (iv) hurricanes that significantly impacted the Debtor's most profitable locations.

34.     Beginning in 2015, the Debtor set aggressive growth targets and sought to expand its brick and mortar locations. Over the past two years, the Debtor opened 21 new store locations across Arizona, California, Florida, Nevada, and Puerto Rico.  The Debtor's rapid expansion into new markets spread the organization too thin to effectively respond to the rapidly changing trends in the retail market. The Debtor's operational struggles were compounded by customers' increasing preference for web-based purchases of items historically purchased at shopping malls. Foot traffic in malls has declined significantly during the last several years, and has led to corresponding declines in revenues at mall-based businesses like the Debtor's.

35.     In an effort to equip the Debtor with the enterprise management tools necessary to leverage its expanded store footprint, including the ability to track inventory position of individual stores and chase profitable sales trends, the Debtor sought to implement the Oracle Retail System in early 2016.  To implement the Oracle Retail System, the Debtor retained the services of Infogain Corporation ("Infogain").  The implementation was fraught with delay and the system did not launch until around August 2017 after the Debtor engaged professionals to oversee the implementation process.  Even after the launch, the Debtor has experienced ongoing problems with Infogain's implementation and has uncovered further defects in the system. The Debtor is currently engaged in arbitration with Infogain regarding Infogain's failure to provide the agreed-on services and systems and the expenses the Debtor has incurred to remedy Infogain's flawed implementation.

36.     Shortly after implementation of the Oracle System, several of the Debtor's most profitable  stores in Texas, Florida, and Puerto Rico were ravaged by Hurricane Harvey, Hurricane Irma, and Hurricane Maria. The hurricanes caused the temporary closure of eight stores in Texas, twelve stores in Florida, and four stores in Puerto Rico, two of which have not

yet reopened.[4] In addition to disrupting sales, the hurricanes also affected the personal lives of many of the Debtor's employees.[5]

37.     The combined impact of the events above resulted in a substantial decrease in the Debtor's sales and earnings. For example, the Debtor's EBITDA has declined by approximately $7.2 million over the past year, from approximately $4.7 million in 2016 to approximately negative $2.5 million in 2017.[6] The decrease in EBITDA has negatively impacted the Debtor's liquidity and its ability to meet obligations as they come due. Furthermore, the Debtor also faces an impending debt maturity—the First Lien Credit Facility is scheduled to mature on January 30, 2018.

## B.     Prepetition Restructuring Initiatives

38.     Throughout 2017, the Debtor has undertaken a review of its business to determine how to address its continuing liquidity constraints.  As part of that review, the Debtor and its officers and professionals have considered various operational and strategic options to increase revenue and control costs.  The review has also involved an analysis of the Debtor's marketing strategy, relationships with strategic partners, labor costs, lease expenses, and a number of other components of the business to identify opportunities to re-direct the Debtor's business to more financially viable outlets while continuing to provide valuable goods and services to the Debtor's loyal customer base.

39.     A central component of the Debtor's review has been a store-by-store analysis to, among other things, identify certain unprofitable stores to close and wind down. The Debtor has

---

[4] The Debtor's insurer initially denied coverage for losses sustained at the Debtor's Puerto Rico locations during these storms, and the Debtor remains in discussions with its insurer regarding these issues.
[5] In response to the tragedy brought on by Hurricane Harvey, the Debtor partnered with the St. Bernard Project, whose mission is to shrink time between disaster and recovery with special focus on rebuilding homes of the victim, and donated 10% of all proceeds from store and online sales during September 9-10, 2017.
https://www.prnewswire.com/news-releases/agaci-stands-strong-with-victims-of-hurricane-harvey-300514360.html.
[6] For the year to date period through November 25th of each year.

been engaged in ongoing negotiations with its landlords in an effort to allow the Debtor to more closely control fixed costs; however, negotiations to date have not yielded significant rent concessions.

40.     Ultimately, the Debtor determined that shifting its focus to its more profitable stores and its online sales warranted the closing of certain store locations.  The Debtor plans to file a motion for authorization to continue store closing or similar themed sales (the "<u>Store Closing Sales</u>") to efficiently liquidate the merchandise and owned furniture, fixtures, and equipment located at such stores.  To maximize the efficiency and net proceeds of the Store Closing Sales, the Debtor entered into an agreement with a liquidating agent to facilitate the Store Closing Sales.

41.     In addition to planning for the Store Closing Sales, the Debtor's management considered the possibilities of marketing the Debtor's business for sale either through Bankruptcy Code section 363 or a plan process.     In January 2018, the Debtor retained SSG Advisors, LLC to assist with exploring such efforts.

42.     The Debtor filed this Chapter 11 Case to maximize value for the benefit of all interested parties by immediately reducing its retail footprint and conducting the process of soliciting interest in the acquisition or refinancing of the Debtor. I believe that Chapter 11 will provide the Debtor with the best opportunity to preserve its business as a going concern, make necessary changes to the Debtor's business plan, eliminate costly lease obligations at unprofitable locations, and thereby preserve value for the Debtor's estate and its stakeholders.

**IV.     FIRST DAY MOTIONS**

43.     Below is an overview of the First Day Pleadings. The First Day Pleadings seek relief intended to facilitate a smooth transition for the Debtor into the Chapter 11 Case and

minimize disruptions to the Debtor's business operations. Capitalized terms used but not otherwise defined in this section of the Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.

**A.      Schedules Motion**

44.      Through the *Debtor's Emergency Motion for Extension of Time to File Schedules of Assets and Liabilities, Schedule of Executory Contracts, and Statement of Financial Affairs* (the "<u>Schedules Motion</u>"),  the Debtor seeks the entry of an order extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedule of executory contracts, and statement of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 30 days, for a total of 44 days from the Petition Date, through and including February 22, 2018.

45.      Because the Debtor made the decision to commence this case shortly before filing its petition and did not have significant time to work on the Schedules and Statements prior to the Petition Date, the Debtor anticipates that it will be unable to complete its Schedules and Statements in the 14 days provided under Bankruptcy Rule 1007(c). Obtaining all necessary information will require the Debtor to expend a substantial amount of time and effort and may require the cooperation of certain third parties.

46.      While the Debtor is mobilizing to work diligently and expeditiously to prepare the Schedules and Statements, the Debtor's resources are limited. In view of the amount of work entailed in completing the Schedules and Statements and the competing demands upon the Debtor's resources to assist in efforts to stabilize business operations during the initial postpetition period, the Debtor will not be able to properly and accurately complete the Schedules and Statements within the required 14-day time period.

47. The Debtor respectfully submits that focusing the attention of key personnel on critical operational and Chapter 11 compliance issues during the early days of this case will help the Debtor make a smooth transition into Chapter 11 and, therefore, ultimately will help maximize the value of the Debtor's estate to the benefit of creditors and parties in interest. Nevertheless, recognizing the importance of the Schedules and Statements in this Chapter 11 case, the Debtor intends to complete the Schedules and Statements as quickly as possible under the circumstances. In view of the amount of information that must be assembled and compiled, I believe the Debtors will require at least thirty (30) additional days to finalize the Schedules and Statements.

48. I believe that the relief requested in the Schedules Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Schedules Motion should be approved.

**B.** **Notice Motion**

49. In the *Debtor's Emergency Motion for an Order (I) Authorizing the Debtor to Redact Certain Personal Identification Information for Individual Creditors, and (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Case and Other Information* (the "Notice Motion"), the Debtor requests entry of an order: (i) authorizing the Debtor to redact certain personal identification information for individual creditors, and (b) approving the form and manner of notice of commencement of this Chapter 11 Case and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

50. The Debtor respectfully submits that cause exists to authorize the Debtor to redact the address information of individual creditors – many of whom are the Debtors' current

and former employees, from the Creditor Matrix because such information could be used to perpetrate identity theft. The Debtor proposes to provide an un-redacted version of the Creditor Matrix to the Court, the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee"), and any official committee of unsecured creditors appointed in this Chapter 11 Case.

51.     Through Kurtzman Carson Consultants LLC, the Debtor's proposed noticing and claims agent (the "Noticing and Claims Agent"), the Debtor proposes to serve the Notice of Commencement, substantially in the form attached to the Notice Motion as **Exhibit 1** to **Exhibit A** (the "Notice of Commencement"). The Notice of Commencement apprises creditors of the filing of this bankruptcy case, the date, time, and location of the 341(a) meeting of creditors, and the deadline by which claims must be filed in this case. The Debtor proposes to serve such Notice of Commencement to **all** creditors and parties-in-interest in this case and have such service be deemed sufficient to provide notice of the 341(a) meeting of creditors and the deadline for filing proofs of claim.

52.     I believe that the relief requested in the Notice Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Notice Motion should be approved.

## C.     Cash Management Motion

53.     In the *Debtor's Emergency Motion for an Order (I) Authorizing Continued Use of Existing Business Forms and Records, (II) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System, (III) Authorizing Payment of Prepetition Costs and Fees Associated with Customer Credit and Debit Card Transactions; and (IV) Waiving Certain*

*U.S. Trustee Requirements* (the "Cash Management Motion"), the Debtor seeks entry of an order (i) authorizing the Debtor to continue using its existing business forms and records; (ii) authorizing the Debtor to maintain the Bank Accounts and Cash Management System (as permitted under any interim and final orders authorizing the Debtor to use Chase's cash collateral (collectively, the "Cash Collateral Orders") and in accordance with any budget(s) approved in connection therewith (the "Budget")); (iii) authorizing the Debtor to maintain its Card Processing System, including the payment of prepetition credit card processing fees and related charges (as permitted under the Cash Collateral Orders and Budget); (iv)granting the Debtor a waiver of certain bank account and related requirements of the Office of the United States Trustee for the Western District of Texas and Bankruptcy Code § 345(b) to the extent that such requirements are inconsistent with (a) the Debtor's existing practices under its Cash Management System or (b) any action taken by the Debtor in accordance with any order granting this Motion or any other order entered in the Chapter 11 Case.

*The Debtor's Bank Accounts*

54. Prior to the Petition Date, in the ordinary course of business, the Debtor used a cash management system (the "Cash Management System") to efficiently collect, transfer, and disburse funds generated by its business operations. The Cash Management System consists of: (i) 10 accounts at JPMorgan Chase Bank, N.A. ("Chase"); (ii) 20 accounts at Bank of America Merrill Lynch ("BAML"); (iii) 20 accounts at Wells Fargo Bank, N.A. ("Wells Fargo"); (iv) 11 accounts at International Bank of Commerce ("IBC"); (v) 3 accounts at Frost Bank ("Frost"); (vi) 1 account at Bank of Hawaii ("BoH"); (vii) 1 account at BBVA Compass Bank ("BBVA Compass"); (viii) 1 account at Comerica Bank; (ix) 1 account at First Tennessee Bank; (x) 1 account at MB Financial Bank; (xi) 1 account at PlainsCapital Bank; (xii) 1 account at

Scotiabank de Puerto Rico ("Scotiabank"); and (xiii) 1 account at SunTrust Bank (collectively, the "Accounts" or "Bank Accounts"). A list of the Bank Accounts is attached to the Cash Management Motion as Exhibit A.

55. Another integral component of the Debtor's Cash Management System is the Debtor's card processing system (the "Card Processing System"). The Debtor has historically received the majority of its receipts through credit and debit cards. For sales in the United States, credit card sales are processed through a credit card processing agreement with Chase and Paymentech, LLC ("Paymentech"). Credit card sales in Puerto Rico are processed by Fusion Merchant Services. The Debtor's Card Processing System is critical to its operations and cash flows.

56. The accounts maintained by the Debtor at Chase (the "Chase Accounts") are:

i. An operating-disbursements account (XXXXX0217) (the "Operating Account"). The Operating Account is the Debtor's primary operating account that the Debtor uses to fund the Payroll Account (defined below), the Payables Account (defined below) and to make other necessary disbursements. Customers can make purchases at the Debtor's store locations or through the Debtor's online store. If a customer purchases with cash, the funds are first deposited at the Debtor's Store Accounts (defined below) and are swept daily into the Operating Account. Credit Card purchases flow through the MasterCard/Visa Account, Amex Account, and Flow Through Account (each defined below) into the Operating Account.

ii. A payroll account (XXXXX0261) (the "Payroll Account"). The Payroll Account is the account used to make payroll transfers. The Payroll Account is funded by the Operating Account.

iii. A payables account (XXXXX0250) (the "Payables Account"). The Payables Account is used for paying down loan balances and is funded by the Operating Account. The Debtor uses checks and ACH transfers and wires for all payables in addition to a company credit card that is used with all vendors that accept credit card payments.

iv. A money market account (XXXXX2628) (the "Money Market Account"). The Money Market Account was used in the past as an overflow account when excess cash was available in the Operating Account. The current balance of the Money Market Account is $80 and the Debtors have no plans to change that balance in the foreseeable future.

v. A P-Card account (XXXXXX8570) (the "P-Card Account"). The P-Card Account has a balance of approximately $38,000 and has not been used in the past five years.

vi. An American Express deposit account (XXXXX0239) (the "Amex Account"). The Amex Account is a ZBA account used for credit card deposits, which are swept daily into the Flow Through Account (defined below) and then into the Operating Account.

vii. A military credit card account (XXXXX9684) (the "Military Credit Card Account"). The Military Credit Card Account is a ZBA account used for credit card deposits generated from customers using a credit card offered by the Army and Air Force Exchange Services, which is a branch of the Department of Defense. This form of payment can only be made at the Debtor's El Paso, Texas location that is in close proximity to Fort Bliss. Funds in the Military Credit Card Account are swept daily into the Flow Through Account (defined below), and then into the Operating Account.

viii. A general credit card deposit account (XXXXX0228) (the "General Credit Card Account"). The Credit Card Account is a ZBA account used for credit card deposits generated from customers using credit cards other than credit cards offered by American Express or Army and Air Force Exchange Services. The funds in the Credit Card Account are swept daily into Flow Through Account (defined below) and then into the Operating Account.

ix. A credit card flow through account (XXXXX7277) (the "Flow Through Account"). Funds from the Credit Card Account and the Amex Account are swept into the Flow Through Account. The funds in the Flow Through Account are swept daily into the Operating Account.

x. A store deposit account (XXXXX5943) (the "Chase Store Account"). The Chase Store Account is swept into the Operating Account twice per week. Approximately $500 is left in the Chase Store Account to pay banking fees.

57. The Debtor's remaining accounts at BAML, Wells Fargo, IBC, Frost, BoH, BBVA Compass, Comerica Bank, First Tennessee Bank, MB Financial Bank, PlainsCapital Bank, Scotiabank, and SunTrust Bank are deposit accounts for the Debtor's stores, including one cluster account for each banking relationship (collectively with the Chase Store Account, the "Store Accounts"). On a daily basis, two employees from each of the Debtor's stores are required to deposit cash received from sales. The Store Accounts are swept into the Chase Operating Account twice per week.

*Books and Records*

58.	I believe that opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.  The Debtor, in the ordinary course of its business, uses many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the business in which the Debtor is engaged and the numerous other parties with whom it deals, the Debtor needs to use its existing business forms without alteration or change.  Printing new business forms would take an undue amount of time and expense.  Fulfillment of the requirement would likely delay the payment of postpetition claims and negatively affect operations and the value of this estate.

*Use of Bank Accounts and Cash Management System*

59.	I believe that the Debtor's ability to maintain its existing Cash Management System is vital to ensuring the Debtor's seamless transition into bankruptcy.

60.	In light of the other significant strains on the Debtor's personnel and resources during the coming weeks, I am concerned about unnecessary delay and disruption to the Debtor's business and a delay in receipt of funds needed for the Debtor's operations if the Debtor is required to make changes to the Cash Management System. In order to conduct its postpetition business, the Debtor needs to be able to issue checks to vendors, service providers, employees, and others. To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtor's business and a delay in receipt of funds needed for the Debtor's operations. The Debtor will add the designation "Debtor in Possession" or "DIP" to any checks in its possession and instruct the Debtor's Banks to add the designation to current and any future Accounts.

61.     To the best of my knowledge, the Bank Accounts are in financially stable institutions that are insured by the Federal Deposit Insurance Corporation (the "FDIC") up to the applicable limit.

62.     The Debtor's Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtor's reorganization efforts.

*Continued Use of Store Accounts at IBC, BoH, BBVA Compass, and Scotiabank*

63.     It does not appear that IBC, Frost, BoH, BBVA Compass, or Scotiabank (collectively, the "Store Account Banks") are authorized depositories in the Western District of Texas. I believe that requiring the Debtor to change its deposits and other procedures with the Store Account Banks could result in harm to the Debtor, its creditors, and the estate because such change would disrupt the Cash Management System. Conversely, I believe the Debtor's estate and creditors will not be harmed by the Debtor's maintenance of the status quo because of the relatively safe and prudent practices already utilized by the Debtor

*Prepetition Credit Card Processing Fees and Related Charges*

64.     The majority of the Debtor's revenue is generated from credit and debit card sales through its Card Processing System. I believe the Debtor can only meet its fiduciary duties as a debtor in possession by having the authority to maintain its Card Processing System, including authority, but not direction, to satisfy any outstanding pre-petition obligations on account of credit card processing fees, chargebacks, and other related obligations.

65.     In the Debtor's business judgment, the ability to pay fees relating to its Card Processing System, including any related pre-petition amounts, is critical to the Debtor's successful prosecution of the Chapter 11 Case. Any inability on the Debtor's part to continue to satisfy pre-petition obligations with respect to its Card Processing System would threaten the Debtor's ability to continue to accept credit cards, thereby disrupting customers' experience and potentially depriving the Debtor and its estate of significant revenue.

*Payroll and Tax Accounts*

66.     I believe that the Debtor's payroll obligations may be more efficiently met through its existing Cash Management System and its existing Bank Accounts, and that requiring the establishment of a new payroll account would be unnecessary and disruptive to its business.

67.     I believe that the Debtor can pay its tax obligations most efficiently from the existing Bank Accounts in accordance with its existing practices, and that the U.S. Trustee can adequately monitor the flow of funds into, between, and out of the Bank Accounts. The creation of new accounts designed solely for tax obligations would be unnecessary and inefficient.  With the current system, the Debtor is current on its payroll tax obligations and anticipates remaining current on such obligations.

68.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

**D.     Claims Agent Application**

69.     In *Debtor's Application for Entry of an Order, Pursuant to 28 U.S.C. § 156(c),*
*Authorizing the Retention and Appointment of Kurtzman Carson Consultants LLC as Claims,*
*Noticing, and Balloting Agent Nunc Pro Tunc to the Petition Date* (the "Claims Agent
Application"), the Debtor seeks entry of an order appointing Kurtzman Carson Consultants LLC
as the Claims and Noticing Agent for the Debtors in the Chapter 11 Case, including assuming
full responsibility for the distribution of notices and the maintenance, processing, and docketing
of proofs of claim filed in the Debtor's Chapter 11 Case. It is my understanding that KCC has
substantial experience in matters of this size and complexity and has acted as the official claims
and noticing agent in many large bankruptcy cases. I believe that KCC is fully equipped to
manage claims issues and provide notice to creditors and other interested parties in the Chapter
11 Case and, therefore, on behalf of the Debtor, I respectfully submit that the Claims Agent
Application should be approved.

**E.     Wage and Benefits Motion**

70.     The Debtor also filed *Debtor's Emergency Motion for an Order Authorizing the*
*Debtor to (I) Pay Certain Prepetition (A) Employee Wages, Other Compensation and*
*Reimbursable Employee Expenses and (B) Independent Contractor Obligations; and (II)*
*Continue Employee Benefits Programs* (the "Wage and Benefits Motion").  In the Wage and
Benefits Motion, the Debtor seeks authority under Bankruptcy Code §§ 105(a), 507(a)(4) and
507(a)(5) and Bankruptcy Rule 6003 to pay certain prepetition obligations owed to either
Employees (defined below) or those who provide employee benefits, to honor and continue
Employee Obligations (defined below) and to authorize financial institutions to receive, process,
honor, and pay checks presented for payment and electronic payment requests relating to
prepetition Employee Obligations.

71.     As more fully described in the Wage and Benefits Motion, the Debtor seeks authority to pay the following aggregate amounts on account of prepetition Employee Obligations:

| Employee Obligations | Unpaid Prepetition Amount |
|---|---|
| Employee Wage Obligations | $880,000 |
| Payroll Software Fees | $100,000 |
| Independent Contractor Compensation | $22,000 |
| Unremitted Payroll Taxes and Deductions | $222,000 |
| Unpaid Payroll Tax Processing Fees | $0 |
| Employee Bonus Plans | $2,000 |
| Reimbursable Expenses and A'GACI Credit Cards | $122,000 |
| PTO | $340,000 |
| Employee Benefits | TBD[7] |

72.     As of the Petition Date, the Debtor employed 69 salaried employees and 2,056 hourly employees (collectively the "Employees"). Store Employees make up the largest segment of the Debtor's workforce. Each of the Debtor's store locations has between 15 and 70 employees, depending on the size and business demands of the location. Each store location typically has one manager and two to three co-managers. The Employees are responsible for the ongoing business operations of the Debtor. The Employees' skills, knowledge and understanding with respect to the Debtor's operations are essential to the effective reorganization of the Debtor's financial affairs.

---

[7] As discussed in more detail below, the Debtor's Medical Plan is self-funded. As a result, there is a delay period between a claim being incurred and being submitted to the Debtor. Therefore, the amount of prepetition claims attributable to Employee Benefits such as the Medical Plan is unknown at this time.

4820-1243-5290

73.     In addition to the Employees, the Debtor also retains from time to time specialized individuals as independent contractors to complete discrete projects and to fulfill certain duties (the "Independent Contractors"). As of the Petition Date, the Debtor employed 9 Independent Contractors. The Independent Contractors are a critical supplement to the Debtor's Employees.

*Employee Wage Obligations and Payroll Software Fees*

74.     In the ordinary course of business, the Debtor pays its Employees for, among other things, salaries, wages, overtime, car allowances, and other obligations (collectively, the "Wage Obligations"). The Debtor pays its Employees on a bi-weekly cycle. Payroll is processed on Wednesday and covers the two-week period through the prior Saturday. Each pay-day, the Debtor either direct deposits the Employees' paychecks into the Employees' accounts, or pays the Employees via pay card. The Debtor uses Kronos for payroll planning and time-keeping functions; however, the Debtor administers payroll itself. On average, the Debtor pays Kronos approximately $12,000 per month for this service (the "Payroll Software Fees"). As of the Petition Date, the Debtor estimates that it owes Kronos approximately $100,000 (the "Unpaid Payroll Software Fees").

75.     The Debtor's most recent payroll was paid on January 5, 2018, which covered the time period ending on December 31, 2017. The Debtor estimates that, as of the Petition Date, approximately $880,000 in wages and salaries earned by the Employees prior to the Petition Date have accrued and remain unpaid (the "Unpaid Wage Obligations"). Included in the calculation of Unpaid Wage Obligations is $60,000 of unpaid wages and salaries owed to 120 of the Debtor's former Employees that were terminated by the Debtor between the January 5, 2018 pay day and the Petition Date (the "Terminated Employees").

76.     With two exceptions, the Debtor does not believe that the Unpaid Wage Obligations owed to any one employee exceed $12,850. The two exceptions are David Won and John Won. The Debtor is *not* seeking to pay any Unpaid Wage Obligations on account of any prepetition work performed by any Employee, as applicable, in excess of $12,850.

77.     Pursuant to the Wages and Benefits Motion, the Debtor seeks authority to pay the Unpaid Payroll Software Fees as well as the Unpaid Wage Obligations (including Unpaid Wage Obligations owed to Terminated Employees), subject to a cap of $12,850 per Employee, in the ordinary course of business and consistent with past practice, and to continue to pay Wage Obligations and the Payroll Software Fees in the ordinary course of the Debtor's business on a postpetition basis.

*Independent Contractor Compensation*

78.     The Debtor relies on Independent Contractors in the ordinary course of its business. The Independent Contractors provide a wide range of services that are critical to the Debtor's operations, including, among other things, providing information technology and marketing assistance, as well as other tasks in furtherance of the Debtor's business.

79.     As of the Petition Date, the Debtor estimates that Independent Contractors are owed an aggregate of approximately $22,000 on account of services rendered prior to the Petition Date (the "Unpaid Independent Contractor Compensation"). The Debtor does not believe that it owes any individual Independent Contractor amounts in excess of $12,850 is not seeking to pay Unpaid Independent Contractor Compensation on account of any prepetition work performed by any Independent Contractor, as applicable, in excess of $12,850.

*Payroll Taxes and Deductions*

80. In various jurisdictions, A'GACI is required by law, to withhold amounts from the Wage Obligations related to income taxes, healthcare taxes, and other social welfare benefits, including social security, Medicare taxes, and unemployment insurance (collectively, the "Withholding Taxes") for remittance to the appropriate taxing authorities (collectively, the "Taxing Authorities").

81. In certain circumstances, A'GACI is also required to make additional payments from its own funds in connection with the Withholding Taxes (the "Employer Taxes," and collectively with the Withholding Taxes, the "Payroll Taxes"). In the aggregate, the Payroll Taxes total approximately $380,000 for each bi-weekly payroll. As of the Petition Date, the Debtor estimates that it owes approximately $127,000 on account of prepetition Payroll Taxes (the "Unremitted Payroll Taxes").

82. During each applicable pay period, A'GACI also routinely withholds other amounts from certain Employees' gross pay, including garnishments, child support, and deductions related to various Employee Benefits (defined below) (collectively, the "Deductions" and, together with the Payroll Taxes, the "Payroll Taxes and Deductions"). As of the Petition Date, the Debtor estimates that it owes approximately $95,000 on account of prepetition Deductions.

*Payroll Tax Processing*

83. The Debtor's Payroll Taxes are managed by ADP, LLC ("ADP"). ADP also administers the Debtor's 401(k) Plan (defined below). On average, the Debtor pays ADP approximately $8,000 per month for its services (the "Payroll Tax Processing Fees").

*Employee Bonus Plans*

84.     To ensure optimal performance by Employees, the Debtor has implemented the

bonus plans described below (collectively, the "Employee Bonus Plans").

- <u>Store Manager Sales Bonus</u>**:**  The Debtor maintains a store manager sales bonus plan for all store managers. The Store Manager Sales Bonus is based upon sales and payroll targets: when a store makes 5% over its sales plan and maintains +/- 2% in matrix payroll hours for the month, the store manager is entitled to receive a bonus of $1,000.

- <u>Store Manager Shrink Bonus</u>:  The Debtor maintains a store manager shrink bonus plan for all store managers. The Store Manager Shrink Bonus is paid upon the conclusion of every physical inventory count, which occurs three times a year. When an A'GACI store's shrink result is less than 2%, the store manager is entitled to receive a bonus of $1,000.  When an O'Shoes store's shrink result is less than 1.5%, the store manager is entitled to receive a bonus of $500.

- <u>District Manager Sales Bonus</u>:  The Debtor maintains a district manager sales bonus plan for all district managers. The District Manager Sales Bonus is based upon sales and payroll targets: when a district makes 5% over its sales plan and maintains +/- 2% in matrix payroll hours for the quarter, the store manager is entitled to receive a bonus of $2,500.

- <u>District Manager Shrink Bonus</u>:  The Debtor maintains a district manager shrink bonus plan for all district managers. The District Manager Shrink Bonus is paid upon the conclusion of every physical inventory count, which occurs three times a year. When the district's shrink result is less than 2%, the district manager is entitled to receive a bonus of $5,000.

- <u>Non-store Bonus</u>:  The Debtor maintains a non-store bonus plan for Employees that work at its company headquarters and its Von Ormy Distribution Center. The non-store bonus is based upon (i) earnings before income tax ("<u>EBIT</u>"), (ii) sales, and (iii) the Employee's actual amount of payroll for the year:

    o  if the Debtor's EBIT is 5% to 6.99% of sales, then the amount of the non-store bonus is 3% of the applicable Employee's actual amount of payroll for the year;

    o  if the Debtor's EBIT is 7% to 9.99% of sales, then the amount of the non-store bonus is 5% of the applicable Employee's actual amount of payroll for the year; and

       ○   if the Debtor's EBIT is above 10% of sales, then the amount of the non-store bonus is 8% of the applicable Employee's actual amount of payroll for the year.

85.     As of the Petition Date, $2,000 of Store Manager Sales Bonuses were earned by two of the Debtor's store managers ($1,000 each) and remain unpaid (the "Unpaid Store Manager Bonuses").

### *Reimbursable Business Expenses and the A'GACI Credit Cards*

86.     Prior to the Petition Date and in the ordinary course of business, the Debtor reimbursed certain Employees for certain business expenses incurred in the ordinary course of their employment. This includes expenses relating to, among other things, mileage reimbursements, cell phone reimbursements, and a variety of miscellaneous expenses (the "Reimbursable Expenses").

87.     All of the Reimbursable Expenses were incurred on the Debtor's behalf in connection with employment by the Debtor and in reliance upon the understanding that such expenses would be reimbursed. As of the Petition Date, the total amount of Reimbursable Expenses owed is estimated to be approximately $50,000.

88.     Additionally, the Debtor provides certain Employees with business related credit cards (collectively, the "A'GACI Credit Cards") through JPMorgan Chase Bank, N.A. ("Chase"). The A'GACI Credit Cards are used to pay certain business expenses on behalf of the Debtor, including travel expenses. The Debtor then pays Chase in the ordinary course of business. Generally, the payment to Chase occurs once a month when due, and the balance for the A'GACI Credit Cards is paid in full at such time. The Debtor estimates that the prepetition balance owing on the A'GACI Credit Cards as of the Petition Date is approximately $72,000.

### *Paid Time Off and Other Benefits*

89.     The Debtor provides slightly different paid time off ("PTO") and other benefits depending on location, as shown in the chart below.

| | Sick Days – Full Time Employees | Sick Days – Part Time Employees | Paid Time Off/Vacation |
|---|---|---|---|
| **California** | N/A | Granted 24 hours on June 1st each year | Full time Employees can accrue .058 hours of PTO per hour worked, with a maximum of 120 hours or 15 days of PTO per year. The accrual cap with previous year carry over is 210 hours. |
| **Puerto Rico** | Accrue at a rate of 1 day or 8 hours for every calendar month in which the Employee has worked 115 or more hours. A maximum of 15 days can be carried over to successive years. | Accrue at a rate of 1 day or 8 hours for every calendar month in which the Employee has worked 115 or more hours. | Full time and part time Employees accrues PTO at a rate of 1.25 days or 10 hours for each calendar month in which the Employee has worked 115 or more hours. The maximum accrual each year is 15 days or 120 hours. |
| **All Other Locations** | N/A | N/A | Full time Employees that have been employed longer than 90 days begin accruing paid vacation time retroactive to their hire date. Full time Employees can accrue a maximum of 120 hours or 15 days of PTO per year. A maximum of 40 hours are allowed to be carried over year to year. |

90.     Sick days may not be rolled over and are not eligible for cash payout. Employees are not permitted to cash-out PTO hours on demand; however, upon termination of employment, the Debtor's practice has been to pay terminated employees for the unused, accumulated PTO.  As of the Petition Date, the cash balance of accrued PTO is approximately $340,000.

*Employee Benefit Plans*

91.     The Debtor maintains various employee benefit plans and policies for health care, dental, vision, disability, life, accidental death and dismemberment insurance, flexible spending and 401(k) savings plan (collectively, and as discussed in more detail below, the "Employee Benefits").

### i.     *Medical Insurance*

92.     All full-time Employees (Employees that work over 30 hours per week)[8] that have been employed by the Debtor for over 60 days are eligible to receive medical, prescription drug, dental, and vision insurance coverage on the next fiscal month after the 60 day period is completed.

93.     The Debtor provides its Employees with medical insurance and prescription drug coverage through a self-funded health plan (the "Medical Plan") administered by Meritain Health, Inc. ("Meritain") with a $100,000 per-occurrence stop-loss policy in place (the "Stop-Loss") with Meritain. The Debtor's premium obligation under the Stop-Loss policy varies depending on the number of covered Employees; the January 2018 monthly premium was $26,129.  As of December 2017, a total of 295 of the Debtor's employees are covered under the Medical Plan. The Employee portion of the cost of the Medical Plan is deducted each payroll period from the Employee's total pay. Each month, the Debtor pays a monthly administration fee to Meritain based on the number of covered employees; the January 2018 administration fee for the administration of the Medical Plan was $15,591.

94.     In addition to paying the administration fee, because the Medical Plan is self-funded, each week the Debtor pays for claims that have been incurred by the Employees under the Medical Plan. Because of the nature of a self-funded plan, it is impossible to predict the

---

[8] Part-time Employees that are promoted to full-time status are eligible to begin receiving Health Benefits at the beginning of the next month after their promotion.

amount of claims that the Debtor will be required to pay for any given week. In 2017, the Debtor paid approximately $1 million in claims under the Medical Plan.

### ii. Dental, Vision, Life, and Disability Coverage

95.     In addition to coverage under the Medical Plan, the Debtor also provides certain Employees with the option to enroll in dental and vision insurance, life insurance, accidental death and dismemberment insurance, long and short-term disability insurance (collectively, the "Supplemental Benefits"). Sun Life administers the Supplemental Benefits. The Debtor provides a basic life policy and accidental death and dismemberment policy to all full-time Employees that are enrolled in the Medical Plan at no cost to the Employees.  The Debtor does not cover the cost of the premium for dental insurance, vision insurance, or short-term disability insurance. The total premium paid by the Debtor in connection with its share of Supplemental Benefits is approximately $650 per month.

### iii. FSA Accounts

96.     In addition to providing the Health Benefits, certain of the Debtor's Employees also have flexible spending accounts for dependent and/or health care (the "FSA Accounts") administered by Benefit Management Administrators.  Each payroll period a pre-determined sum is deducted from the participating Employee's total pay and deposited in the Employee's designated flexible spending account.

97.     Because the Health Benefits and FSA Accounts are vital to the Employees and because the vast majority of the funds constituting unpaid Health Benefits are held in trust for the Employees and are not property of the Debtor's estate, the Debtor seeks authority to remit all prepetition amounts owing for FSA Accounts, and to continue providing the FSA Accounts in the ordinary course of business on a post-petition basis.

### iv. 401(k) Plan

98.     All Employees that have been employed by the Debtor for a minimum of six months and are over eighteen years of age are eligible to participate in a 401(k) plan (the "401(k) Plan") managed by ADP.  Approximately 140 Employees participate in the 401(k) Plan.  The Debtor does not provide matching funds or otherwise incur costs relating to the management of the 401(k) Plan.  For participating Employees, 401(k) funds are deducted from the Employees' payroll and deposited in the 401(k) Plan.

*Honoring Obligations to Employees Will Benefit the Debtor and Its Estate*

99.     With two exceptions, the Debtor does not believe that the total combined Wage Obligations, Reimbursable Expense obligations, and Health Benefits owed to any one employee exceeds $12,850 earned within the 180 days prior to the Petition Date. The prepetition Wage Obligations owed to David Won and John Won exceed $12,850. With respect to prepetition Wage Obligations owed to David Won and John Won, the Debtor is only requesting authorization to pay up to $12,850, and is not requesting authorization to pay remit payment for Wage Obligations in excess of $12,850.

100.     In order to maintain the continuity of its business and to preserve the morale of its vital labor force, it is essential that the Debtor be permitted to pay the funds requested through this Motion. The Debtor seeks the relief requested in this Motion on an emergency basis because any delay or disruption in providing employee compensation will destroy the Debtor's relationship with the Employees and irreparably impair workforce morale at the very time when the dedication, confidence, and cooperation of these individuals is most critical. The Debtor faces the risk that its operations may be severely impaired if authority is not granted for the Debtor to make the payments described above.

101.     Because the amounts represented by Wage Obligations are needed to enable the Employees to meet their own personal obligations, absent the relief requested herein, they will suffer undue hardship and, in many instances, serious financial difficulties. Moreover, without the requested relief, the stability of the Debtor would be undermined by the potential threat that otherwise loyal Employees would seek other employment.

102.     The Debtor also believes that the uninterrupted performance by the Independent Contractors is essential to conducting services that are critical to the Debtor's operations and to the Debtor's efforts to maintain a steady cash flow from  its  business throughout the Chapter 11 Case.  Requiring the Debtor to seek to replace the Independent Contractors would significantly disrupt its operations and hamper its reorganization efforts.

103.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Wages and Benefits Motion should be approved.

**F.  The Tax Motion**

104.     In the *Debtor's Emergency Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a)(8) (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers* (the "Tax Motion"), the Debtor seeks the entry of an order, pursuant to Bankruptcy Code §§105(a), 363, and 507(a)(8) authorizing, but not directing, the Debtor to pay various prepetition taxes and fees, including prepetition sales and use taxes, prepetition property taxes and prepetition franchise and/or income taxes (collectively, the "Prepetition Taxes") to the appropriate taxing authorities

(each a "<u>Taxing Authority</u>," and collectively, the "<u>Taxing Authorities</u>") in the ordinary course of business, on an unaccelerated basis, as such payments become due and payable and to the extent adequate funds are available to make such payments.

105.     In the ordinary course of business, the Debtor incurs, or collects, various taxes and remits such taxes to the Taxing Authorities.  Before the Petition Date, the Debtor has generally paid its undisputed Prepetition Taxes in a timely fashion in accordance with and subject to applicable grace periods, if any.  The Debtor remains current on its sales and use taxes (which are remitted monthly) and other trust fund taxes.  The Debtor is also not delinquent on its franchise taxes.

*Property Taxes*

106.     The Debtor owns or leases real property and personal property that are subject to state and local real ("<u>Real Property Taxes</u>") and business personal property taxes (the "<u>BPP Taxes</u>" and together with Real Property Taxes, the "<u>Property Taxes</u>"). Property Taxes are assessed and due annually, and become delinquent at various times, either in the year they are assessed or in the following year.  Property Taxes are assessed and become payable in the ordinary course of business and are typically calculated based on a statutorily mandated percentage of property value.

107.     As of the Petition Date, the Debtor is current on all of its Property Tax obligations. The Debtor estimates that in the period between the Petition Date and July 31, 2018, Real Property Taxes in the amount of approximately $610,000 and BPP Taxes in the amount of approximately $95,000 for 2017 will become due and payable. The Debtor estimates that Real Property Taxes of approximately $230,000 will become due and owing within 30 days. The

Debtor requests authority, but not direction, to continue to pay the Property Taxes if and when they become due and payable during the pendency of the Chapter 11 Case.

108.     The Debtor uses DuCharme, McMillen, and Associates, Inc. ("DMA") a third-party tax processing company to process and remit Property Taxes. As of the Petition Date, the Debtor estimates that it owes DMA approximately $3,300 for accrued and unpaid prepetition fees (the "DMA Fees"). Through this Motion, the Debtor seeks authority to pay the DMA Fees to prevent interruption in the processing and payment of Property Taxes.

*Franchise Taxes*

109.     The Debtor has franchise tax obligations (the "Franchise Taxes") it must pay to the Taxing Authorities to remain in good standing and maintain the right to operate its business. The Franchise Taxes are assessed and due annually, and generally become delinquent during the following year.

110.     As of the Petition Date, the Debtor believes that no Franchise Tax amounts are delinquent to the Taxing Authorities as all Franchise Taxes for years prior to 2016 have been assessed and paid prior to the Petition Date.  With regard to 2017 Franchise Taxes, the Debtor estimates that it will owe approximately $520,800.

*Certain State and Local Income Taxes*

111.     Under certain applicable laws, state or local authorities, or both, levy taxes based on the Debtor's income (the "State and Local Income Taxes"). In certain states, state and local authorities are entitled to statutory liens on the Debtor's property located in, or subject to tax, in the respective state if these income taxes are not paid. Moreover, in certain states, the Debtor's directors and officers have personal liability for failure to timely pay these taxes.

112.    The Debtor estimates that it does not owe any prepetition amounts with respect to State and Local Income Taxes.

*Sales and Use / Trust Fund Taxes*

113.    Certain Taxing Authorities require the Debtor to collect from its customers, and/or for the Debtor to pay as a customer, sales and use taxes that are based on a percentage of sales prices and other trust-fund taxes (the "Trust Fund Taxes"). In most cases, the Trust Fund Taxes are paid in arrears once collected. While it is difficult for the Debtor to estimate the precise amount of Trust Fund Taxes owed as of the Petition Date, as such taxes are taken into account in the invoices either generated by or paid by the Debtor, the Debtor currently estimates that sales tax due in January for December sales will total approximately $1,900,000, which will become due and owing within 30 days.

*Business Volume Taxes*

114.    The Debtor is required to pay "Patente Municipal" or business volume taxes (the "Business Volume Taxes") to certain Taxing Authorities in the Commonwealth of Puerto Rico to operate its businesses in the applicable municipality.  As of the Petition Date, the Debtor is current on all of its Business Volume Tax obligations. The Debtor estimates that in the period between the Petition Date and July 31, 2018, Business Volume Taxes in the amount of approximately $175,000 will become due and payable.

*Business Licenses, Permits, and Other Fees*

115.    The Debtor is required to pay various taxes and fees for business licenses, various permits, and other similar types of taxes and fees (the "Regulatory Fees" and collectively with the Property Taxes, the DMA Fees, the Franchise Taxes, the State and Local Income Taxes, the Trust Fund Taxes, and the Business Volume Taxes, the "Taxes and Fees") in order to

continue conducting their business pursuant to state and local laws. The Debtor remits the required amounts for the Regulatory Fees on a monthly, quarterly, or annual basis, depending on the requirements of the particular Taxing Authority. The Debtor does not believe that there are any Business Fees due and owing as of the Petition Date, but as a precautionary measure, requests authority to pay any such prepetition Regulatory Fees up to an amount of $10,000, and authority to pay postpetition Regulatory Fees if and when they become due and payable during the pendency of the Chapter 11 Case.

116.    Failure to pay Prepetition Taxes may subject the Debtor's estate to additional liens, penalties, and interest expenses.  In the event the Debtor has additional obligations to its Taxing Authorities, it may be costly and administratively burdensome for the Debtor's management during the Chapter 11 Case and an unnecessary distraction for the Debtor, and this Court, to address potential enforcement actions by Taxing Authorities.  Therefore, I believe that it is in the best interests of the Debtor's estate to limit the impact of the foregoing distractions by obtaining authorization, but not direction, to pay Prepetition Taxes as the Debtor deems appropriate in its business judgment.

### G.  Insurance Motion

117.    Through the *Debtor's Emergency Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtor to (I) Continue its Insurance Policies, and (II) Pay Insurance Premiums Thereon* (the "<u>Insurance Motion</u>"), the Debtor is requesting, pursuant to Bankruptcy Code §§ 105(a) and 363(c), the entry of an order authorizing the Debtor (i) to continue to administer the Insurance Policies in the ordinary course of business, (ii) to pay outstanding prepetition amounts due under the Insurance Policies, (iii) to renew or enter into new insurance policies upon the expiration of the existing Insurance Policies, and (iv) to continue to

pay premiums for the Insurance Policies in the ordinary course of business to the extent they may become due and payable on a post-petition basis according to the terms of the Insurance.

118.    To the extent that the automatic stay would affect the rights of any of the Debtor's employees to proceed with valid workers' compensation claims ("Workers' Compensation Claims") against any relevant workers compensation policies (the "Workers' Compensation Programs"), the Debtor seeks authorization to modify the automatic stay imposed by Bankruptcy Code § 362 to permit these workers to proceed with their claims under the Workers' Compensation Programs.

119.    In connection with the operation of its business, the Debtor maintains various insurance policies (each an "Insurance Policy," and collectively the "Insurance Policies"), which the Debtor has obtained through third-party insurance providers (collectively, the "Insurance Providers") including, without limitation, coverage for commercial property, workers' compensation, general liability, automobiles, management liability, and umbrella insurance. The following is a summary of the Insurance Policies:

| Carrier | Policy No. | Description | Policy Term | Premium | Coverage | Deductible |
|---------|-----------|-------------|-------------|---------|----------|-----------|
| Travelers Insurance | 44167813 | Property - US | 1 Year – August | $209,983 – paid in full | $5 million, $2.5 million Flood Zones & CA | $50k per incident |
| QBE Insurance | 55-CP-000057940-0 | Property – Puerto Rico | 1 Year - August | $23,993 – paid in full | $5.2 million (each store has its own limits) | $25k per incident |
| Travelers Insurance | UB-7J477434 | Workers' Compensation & Employer's Liability | 1 Year - August | $289,496 monthly | $1 million per accident | None |
| Travelers Insurance | 44167813 | General Liability | 1 Year - August | $124,972 – paid in full | $2 million aggregate/$1 million per occurrence | $75k per incident |

| Carrier | Policy No. | Description | Policy Term | Premium | Coverage | Deductible |
|---|---|---|---|---|---|---|
| Travelers Insurance | 44167813 | Umbrella | 1 Year – August | $14,902 monthly | $5 million general aggregate | $10,000 retained limit |
| Arch Insurance | 44167813 | Director & Officer | Earlier of bankruptcy emergence or August 2019 | $300,000 – paid in full | $3 million | D&O $25,000/ emp prac $100,000 |
| Travelers Insurance | CYB-2001-0710 | Cyber | 1 Year - August | $33,678 monthly | $5 million network & IT/ $1 million comm & med | $100k per incident |
| Travelers Casualty and Surety Company of America | 105894561 | Crime | 8/1/17-8/1/2020 | $0* | | |
| Travelers Insurance | 44167813 | Global Liability | 1 Year - August | $1,500 – paid in full | $1 million incident/ $2 million max | $1,000 per occurrence (standard ded.) |

*policies' premiums covered under other policies

120.    The Debtor pays premiums to the Insurance Providers for coverage under the Insurance Policies (collectively, the "Insurance Premiums").  The Insurance Premiums are based upon a fixed rate established and billed by each Insurance Provider.  The premiums for most of the Insurance Policies are determined annually.  A monthly broker fee of $5,000 is paid to USI.

121.    The Debtor believes it is current on all monthly premium payments on the Insurance Policies as of the Petition Date.

122.    It is essential to the Debtor's continued operation and reorganization efforts that the Debtor maintain the Insurance Policies on an ongoing and uninterrupted basis.  The Insurance Policies provide a comprehensive range of coverage for the Debtor and its properties.

I believe that allowing the Insurance Policies to lapse would expose the Debtor to substantial liability for any damages resulting to persons or property of the Debtor and others, and the Debtor would have to bear the costs and expenses of defense litigation.

123. It is my understanding that most, if not all, of the Debtor's obligations under the Insurance Policies will constitute postpetition obligations of the Debtor's estate. However, because certain of the Debtor's obligations under the Insurance Policies may constitute prepetition claims, I believe that it is in the best interests of the Debtor and its estate to seek authorization from the Court to pay any prepetition obligations relating to the Insurance Policies.

124. The nonpayment of any premiums or related fees under any of the Insurance Policies could result in one or more of the Insurance Providers terminating their existing policies, declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtor in the future. Such action could expose the Debtor and its estate to risks for which there is no insurance coverage. The Debtor lacks a legal mechanism to require its insurers to continue providing coverage that the insurer would not be obligated to provide absent payment of premiums by the Debtor.

125. To the extent the Debtor's Employees hold valid workers' compensation claims (the "Workers' Compensation Claims") under any relevant workers compensation policies (the "Workers' Compensation Programs"), prohibiting the Employees from proceeding with their claims against the Workers' Compensation Programs could have a detrimental effect on the financial well-being and morale of the Employees and lead to their departure. I believe that any such departure, along with the general decline in morale that would be likely to occur amongst all Employees that became aware of the circumstances, could severely disrupt the Debtor's business to the detriment of all parties-in-interest.

### H. The Utilities Motion

126.     Through the *Debtor's Emergency Motion for an Order Under 11 U.S.C.* *§§ 105(a) and 366 (I) Prohibiting Utility Companies From Altering or Discontinuing Service on* *Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of* *Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for* *Additional Adequate Assurance of Payment* (the "Utilities Motion"), the Debtor seeks entry of an interim order (i) prohibiting the Utility Companies from altering or discontinuing service on account of unpaid prepetition invoices, (ii) establishing the Procedures (as defined below) for resolving any disputes regarding requests for adequate assurance of payment, and (iii) scheduling a final hearing on the Motion (the "Final Hearing") within thirty (30) days of the Petition Date.

127.     In the normal conduct of its business operations, the Debtor has relationships with many different utility companies and other providers (each a "Utility Company" and, collectively, the "Utility Companies") for the provision of electric, water, sewer, natural gas, trash removal, alarm, telephone, cellular telephone, internet services, and similar utility products and services (collectively, the "Utility Services") at its corporate headquarters as well as at its various lease locations.  The Utility Companies include, without limitation, the entities set forth on the list attached to the Utilities Motion as Exhibit A.

128.     It is my understanding that the average monthly amount owed to the Utility Companies is approximately $160,000.[9]  I also understand that the Debtor has placed deposits totaling approximately $150,000[10] with certain Utility Companies (each an "Existing Utility

---

[9] I believe that this number is likely overstated due to the fact that the Debtor has recently exited certain of its stores and the Debtor's accounts payable system has not been fully updated to reflect those changes. Therefore, the Debtor will likely not be purchasing utility services from all of the Utility Companies currently included on Exhibit A. Nevertheless, out of an abundance of caution, the Debtor is using a trailing 12 month average to ensure that it is not underestimating future utility obligations.

[10] Historically, the Debtor has not reported on the amount of Existing Utility Deposits in the ordinary course of business, and the actual amount of Existing Utility Deposits may vary from the Debtor's estimate.

4820-1243-5290

Deposit" and together the "Existing Utility Deposits").  I believe that the Debtor owes certain amounts to Utility Companies as of the Petition Date for prepetition Utility Services.  Due to the timing of the Petition Date in relationship to the Utility Companies' billing cycles, it is my understanding that the Debtor owes prepetition obligations relating to Utility Services that have been invoiced to the Debtor for which payment is not yet due and for Utility Services that have been provided since the end of the last billing cycle but not yet invoiced to the Debtor.

129.    Uninterrupted Utility Services are essential to the continued operations of the Debtor's business.  If the Utility Companies refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted.  If such disruption occurred, the impact on the Debtor's business and revenue would be extremely harmful and would jeopardize the Debtor's efforts to market and sell its business.  It is critical that Utility Services continue uninterrupted and that the relief in this Motion be granted.

130.    The Debtor anticipates that the cash flow from its ongoing business operations will be sufficient to allow the Debtor to pay postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional adequate assurance of payment for future Utility Services, the Debtor will deposit $95,000, a sum greater than 50% of the Debtor's estimated monthly cost of its Utility Services, into a separate, segregated, interest-bearing account, that will be established and funded within twenty business days after the Petition Date (the "Utility Deposit Account"). The Debtor will maintain the Utility Deposit Account with a minimum balance equal to 50% of the Debtor's estimated monthly cost of Utility Services from Utility Companies without an Existing Utility Deposit Account, which may be adjusted by the Debtor to account for the termination of Utility Services by the Debtor or other arrangements with respect to adequate assurance of payment reached with individual Utility

Companies. The Debtor will also maintain all of its Existing Deposits. With the funds in the Utility Deposit Account and the Existing Deposits, the Debtor will have approximately $245,000 in total utility deposits, which is approximately $85,000 greater than the Debtor's average monthly usage.

131. The Debtor further proposes that to the extent the Debtor becomes delinquent with respect to postpetition payment for Utility Services from a Utility Company, such Utility Company may file a notice of delinquency (a "Delinquency Notice") with the Court and serve such Delinquency Notice on (a) the Debtor, (b) counsel to the Debtor, (c) counsel to the official committee of unsecured creditors, if one is appointed, and (d) the United States Trustee for the Western District of Texas (each, a "Party in Interest"). The Debtor proposes that if such delinquency is not cured and no Party in Interest has objected to the Delinquency Notice within ten days of the receipt of the Delinquency Notice, then, with respect to Utility Companies that do not have an Existing Utility Deposit the Debtor will (i) remit to such Utility Company from the Utility Deposit Account the lesser of (a) the amount allocated in the Utility Deposit Account for such Utility Company's account and (b) the amount of postpetition charges claimed as delinquent in the Delinquency Notice, and (ii) replenish the Utility Deposit Account for the amount remitted to such Utility Company. With respect to Utility Companies that have an Existing Utility Deposit, (i) the Utility Company will be permitted to draw down on the Existing Utility Deposit up to the amount of the postpetition charges claimed as delinquent and (ii) the Debtor shall replenish the Existing Utility Deposit the amount drawn down by the Utility Company to cover the delinquent postpetition charges.

132.    I believe that that the Utility Deposit Account and the Existing Utility Deposits, together with the Debtor's ability to pay for future Utility Services in the ordinary course of business, provides sufficient adequate assurance to the Utility Companies

133.    In the event that a Utility Company believes that the aforementioned deposits do not provide sufficient adequate protection, the Debtor is proposing the following procedures (the "Procedures") for the Utility Company to make additional requests for adequate assurance:

a.    If a Utility Company is not satisfied with the assurance of future payment provided by the Debtor, the Utility Company must file and serve an objection setting forth: (i) the location(s) for which Utility Services are provided; (ii) the account number(s) for such location(s); (iii) the outstanding balance for each account; (iv) the amount of any deposit(s) made by the Debtor prior to the Petition Date; (v) a summary of the Debtor's payment history in each account; and (vi) any argument as to why the Utility Company has not been provided adequate assurance of payment (an "Objection").

b.    The Court has scheduled a final hearing on the Motion on [●] at _.m. (Central) (the "Hearing Date") for the purpose of considering any Objections;

c.    Any Objection by a Utility Company listed on Exhibit A must be served upon, and actually received by, (i) the Debtor's counsel, Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219, Attn: Ian T. Peck and David L. Staab, by no later than seven (7) days prior to the Hearing Date. The Debtor may file and serve a reply to any such Objection on or before the date that is two (2) days prior to the Hearing Date.

d.    Without further order of the Court, the Debtor may enter into agreements granting additional adequate assurance to a Utility Company serving a timely Objection, if the Debtor in its discretion determines that the Objection is reasonable.

e.    If the Debtor discovers the existence of a Utility Company not listed on Exhibit A, the Debtor shall, within two (2) business days after discovering the existence of such Utility Company, (i) file a supplement to Exhibit A which supplement shall identify the Utility Company and either the amount of the existing security deposit held by the Utility Company or the additional amount of the adequate assurance deposit the Debtor proposes to place in the Utility Deposit Account, and (ii) serve such Utility Company with notice of entry and a copy of this Interim Order.

f.    In the event that a Utility Company not listed on Exhibit A objects to the Debtor's proposal to provide adequate assurance of payment, such Utility Company must file and serve on counsel for the Debtor an Objection within fourteen (14) days

after the date upon which it receives notice of entry of the Interim Order. A hearing on such Objection will be set by the Court no sooner than seven (7) days after the date upon which such Objection has been filed. The Debtor may file and serve a reply to any such Objection on or before the date that is two (2) days prior to such hearing date.

g. All Utility Companies will be deemed to have received adequate assurance of payment in accordance with Bankruptcy Code § 366, without the need for an additional deposit or other security, until this Court enters an order to the contrary. Any Utility Company that fails to make a timely Request shall be deemed to be satisfied that the Utility Deposit Account provides adequate assurance of payment for future services within the meaning of Bankruptcy Code § 366(c)(2).

134. I believe that the Procedures provide a fair, reasonable, and orderly mechanism for the Utility Companies to seek additional adequate assurance, while temporarily maintaining the status quo for the benefit of all stakeholders.

135. Separate negotiations with each of the Utility Companies would be time-consuming and unnecessarily divert the Debtor's personnel from other critical tasks related to the operation of its business and the restructuring. This is especially true given the fact that the Debtor operates at almost 80 different locations, many of which have separate utility arrangements. In addition, the Debtor has recently exited certain lease locations, but the Debtor has not fully updated its accounts payable system to identify from which utility providers the Debtor will continue to require Utility Services. During the first days of the Chapter 11 Case it would be incredibly difficult, costly, and would divert the Debtor's limited personnel resources to engage in separate negotiations with each potential Utility Company. Further, if individual negotiations were required and the Debtor were to fail to reach early agreements with each Utility Company, it would likely have to file further motions seeking expedited determinations as to adequate assurance or risk service termination.

136. I believe that the relief requested in the Utility Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to

continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Utility Motion should be approved.

**I. Customer Motion**

137.    Through the *Debtor's Emergency Motion for Entry of an Order Authorizing Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Customer Programs in the Ordinary Course of Business* (the "Customer Motion"), the Debtor requests authority in its business judgment to (a) continue, maintain, and/or terminate any Customer Programs, in its discretion, in the ordinary course of business, (b) pay, honor and otherwise satisfy, at the Debtor's discretion, its prepetition obligations thereunder in a manner consistent with past practice, and (c) pay, honor or otherwise satisfy prepetition processing costs and fees associated with the Customer Programs (collectively, the "Customer Obligations").  The Debtor also requests the Court to authorize and direct the Debtor's banks to receive, process, honor and pay all checks and electronic payment request relating to the foregoing.

138.    Prior to the commencement of this Chapter 11 Case, in the ordinary course of business, the Debtor instituted and engaged in certain activities to develop and sustain a positive reputation and relationship with its customers. To that end, the Debtor implemented various customer programs and policies (collectively, the "Customer Programs") designed to ensure customer satisfaction, develop and sustain customer relationships and loyalty, improve profitability, and generate goodwill for the Debtor. As of the Petition Date, the Customer Programs include the Gift Card Program, the My A'GACI Rewards program, Sales Promotions, and Refunds (each as defined below).

139.    In the ordinary course of business, the Debtor maintains a gift card program (the "Gift Card Program") wherein it distributes gift cards (the "Gift Cards") for use in all of its

locations and its online store. Customers may purchase the Gift Cards at any of the Debtor's locations or online on the Debtor's website. Additionally, the Debtor issues gift cards (i) in connection with promotional activities, (ii) in exchange for store credit on returned items, and (iii) in limited circumstances, to resolve customer disputes. The Gift Cards may be used like cash for purchases at the Debtor's stores or on the Debtor's website. The Gift Cards do not have an expiration date.

140.    The Debtor maintains transaction data regarding the sale of its Gift Cards. However, the Debtor does not track and has no information about the identity of the holders of the Gift Cards. The Debtors estimate that the total liability, as of the Petition Date, for all outstanding Gift Cards is approximately $1,000,000.

141.    I believe that continuing to honor the Gift Card Program is essential for maintaining customer goodwill and continuing the Debtor's business. I believe that the negative impact of refusing to honor the Gift Card Program would severely jeopardize the Debtor's relationships with its customers and the Debtor's ability to reorganize successfully. I also believe that the negative publicity could jeopardize the Debtor's ability to attract new customers.

142.    In the ordinary course of business, the Debtor operates My A'GACI Rewards, which is a value-added program that provides rewards to incentivize customers to purchase additional merchandise from the Debtor. My A'GACI Rewards members earn points for making purchases from A'GACI and receive exclusive discount and sale offers. Customers join My A'GACI Rewards by creating an account on the Debtor's website. Under the program, customers typically earn one point for every dollar that they spend.[11] For every 50 points, the customers receive a $5 reward that is redeemable for the purchase of merchandise at checkout. The rewards

---

[11] In limited circumstances, such as on their birthdays, customers can earn double points.

expire 89 days after they are received by the customer. As of the Petition Date, the unamortized balance for My A'GACI Rewards was approximately $8.1 million.

143. From time to time, the Debtor conducts sales promotions at selected stores (the "Sales Promotions"). The Sales Promotions include, among other things, coupons and discounts on purchases. To preserve the goodwill of its customer base, the Debtor seeks authorization to honor the Sales Promotions.

144. The Debtor has traditionally maintained return, refund, and exchange policies. As such, certain customers hold contingent claims against the Debtor for potential refunds, returns, and exchanges (collectively, the "Refunds") relating to goods sold to customers prior to the Petition Date. Generally, under the Debtor's existing policies, customers may return agacistore.com purchases (excluding accessories, intimates, and gift cards) by mailing the merchandise to the Debtor's return department within 30 days with original invoice and price tags. Additionally, customers may return all in-store and online purchases (excluding accessories, intimates, gift cards, and Plus+ returns) to the Debtor's store locations within 30 days of the original purchase date. If the customer has a receipt along with a valid ID, the customer is entitled to a full refund. The Debtor seeks authority to maintain the Refunds policy.

145. It is critical that the Debtor maintain its customer base. If it does not honor its Customer Programs, the Debtor is likely to face negative publicity and substantial ill-will from its customer base. Current customers are more likely to be lost to other stores, and new customers may be frightened off. The Debtor submits that the continuing support of its customers is imperative to its ongoing operations and the viability of its business enterprise. The uninterrupted continuance of the Customer Programs is critical to maintaining and preserving such support.

146.     I believe that the relief requested in the Customer Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Customer Motion should be approved.

**J.   Shippers, Warehousemen, and Miscellaneous Liens Motion**

147.     Through the *Debtor's Emergency Motion for Entry of an Order (i) Authorizing the Debtor to Pay or Honor Prepetition Obligations to Certain Shippers, Warehousemen, and Miscellaneous Lien Claimants, and (ii) Confirming Administrative Expense Priority of Outstanding Orders* (the "Shipper Motion"), the Debtor seeks authority, but not direction, under Bankruptcy Code §§ 105 and 363 to pay or honor prepetition obligations owed to certain Shippers, Warehousemen, and Miscellaneous Lien Claimants (collectively, and as described herein, the "Lien Obligations") and to authorize and direct financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Lien Obligations.

148.     To successfully operate its business, the Debtor must ensure that its retail stores (the "Stores") are continuously replenished with stock for sale to its customers (the "Merchandise").   Inventory planning begins approximately six months in advance of the applicable season.   All Merchandise is purchased from vendors in Los Angeles ("Vendors"). The Vendors manufacture the Merchandise both domestically and internationally.   Depending on where the Merchandise is being shipped from, orders take about 4-6 weeks for delivery to the Von Ormy, Texas distribution center ("Distribution Center"), which is leased and operated by the Debtor.

149.    Inventory comes into the Distribution Center one of two ways: either via UPS or by truck with a consolidator and a long-haul provider ("Shippers").  With regard to consolidators and long haul providers, A'GACI contracts with consolidators that pick up goods from the Vendors. The long-haul then picks up the goods and brings trailers full of Merchandise to the Distribution Center.  Some backstock is kept in the Distribution Center, but it mostly serves as a flow through facility.  Once the Merchandise arrives at the Distribution Center, it first goes through quality control.  Once the quality control process is over, the Merchandise is processed immediately to go out to the Stores.  Some of the Merchandise is kept at the Distribution Center for replenishment purposes.

150.    The Debtor has an e-commerce distribution center ("Warehouse") that is controlled and operated by Radial ("Radial", and together with the Shippers and any bailees capable of asserting a lien on the Debtor's goods, the "Warehousemen").  Radial is responsible for processing and shipping most of the online sales of the Debtor.  Radial also provides related services, such as customer care and support services with respect to the Debtor's online store. Online payments are made from customers to Radial, who then remits the amount owed to the Debtor on the 16th day of each month.

151.    In the event that the Debtor fails to reimburse the Warehousemen for charges incurred in connection with the transport and storage of the Merchandise, various state laws may permit the Warehousemen to assert a statutory lien against the Merchandise in their possession (the "Warehousemen Lien Claims") that is the subject of any delinquent charges, potentially blocking the Debtor's access to the stored or shipped Merchandise.  To maintain access to the Merchandise that is essential to the continued viability of the Debtor's retail operations and to preserve the value of the Merchandise, the Debtor seeks authority to pay any and all prepetition

amounts related to the shipping, warehousing, logistics and other services provided to the Debtor by the Warehousemen prior to the Petition Date (collectively, the "Warehousing Charges"). The Debtor estimates that there are approximately $425,000 in unpaid Warehousing Charges as of the Petition Date.[12]

152.    In order to ensure that the Stores are continuously replenished with Merchandise, the Debtor contracts with numerous third parties (the "Miscellaneous Lien Claimants").

153.    If the Debtor is unable to pay the Miscellaneous Lien Claims, the Debtor risks losing access to inventory and other property that is critical to the continued operation of the Stores. The imposition of a Miscellaneous Lien Claim in one of the Debtor's Stores would also likely violate the provisions of many of its leases and related agreements with its business partners. Accordingly, the Debtor seeks authority to pay and discharge, on a case-by-case basis, Miscellaneous Lien Claims that the Debtor believes have created, or could give rise to, a lien against the Debtor's Stores, property or equipment, regardless of whether such Miscellaneous Lien Claimants have already perfected their interests.[13]

154.    Prior to the Petition Date, the Debtor may have ordered Merchandise that will not be delivered until after the Petition Date (the "Outstanding Orders"). The Vendors may refuse to ship the Merchandise so as not to become general unsecured creditors. To prevent any disruption to the Debtor's business operations, and since the Merchandise would receive 503(b) administrative priority regardless, the Debtor seeks an order (i) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtor

---

[12] Nothing herein shall be deemed an admission by the Debtor as to the validity of any lien or the validity of any claim relating to such lien. The Debtor reserves all of its rights to contest the validity of any lien or claim regardless of whether the Debtor makes a payment pursuant to this Motion or any Order approved hereunder.

[13] To the extent that the Debtor makes any payments with respect to a Miscellaneous Lien Claim, however, no such payment shall be deemed a waiver of the Debtor's right to challenge the extent, validity, perfection or possible avoidance of such liens or the claims underlying any such Miscellaneous Lien Claim.

arising from the acceptance of Merchandise subject to Outstanding Orders, and (ii) authorizing the Debtor to satisfy such obligations in the ordinary course of business.

2. I believe that the relief requested by in the Shipper Motion represents a sound exercise of the Debtor's business judgment, is necessary to avoid immediate and irreparable harm to the Debtor's estate.

155. The Warehousemen and the Miscellaneous Lien Claimants – provide vital goods and services to the Debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations. Indeed, absent the relief requested herein, the Warehousemen may be unwilling to release the Merchandise and Stored Inventory in their possession as to which they may have liens, because releasing possession of the Merchandise and Stored Inventory may convert their claims against the Debtor from secured claims to unsecured claims. Therefore, unless the Court authorizes the Debtor to pay the Warehousemen, it is unlikely the Debtor will continue to have access to the merchandise in the possession of the Warehousemen. More generally, if the Lien Claimants possess lien rights or have the ability to exercise "self-help" remedies to secure payment of their claims, failure to satisfy the Lien Claimants' claims could significantly interrupt the Debtor's retail business operations to the detriment of the Debtor's creditors.

156. Absent the relief requested in the Shipper Motion, I believe the Debtor may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of administrative priority status. As a result, the Debtor's business could be disrupted, which could result in a loss of revenue and harm to the Debtor's estate.

157. I believe that the relief requested in the Shipper Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to

53

continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Shipper Motion should be approved.

### K. The Lease Rejection Motion

158.    Through the *Debtor's Emergency First Omnibus Motion to Reject Certain Unexpired Real Property Leases Pursuant to Bankruptcy Code § 365 and Bankruptcy Rule 6006 Nunc Pro Tunc to the Petition Date and to Abandon Related Personal Property* (the "Lease Rejection Motion"), the Debtor seeks an order rejecting the unexpired leases identified on Exhibit A to the motion (the "Leases") pursuant to Bankruptcy Code § 365, effective nunc pro tunc to Petition Date.

159.    The Debtor is seeking to reject leases for 12 stores that have underperformed and/or otherwise generated losses for the Debtor (the "Rejected Store Locations").  Prior to the Petition Date, the Debtor vacated all the Rejected Store Locations.

160.    On January 5, 2018, the Debtor sent notices to each of the landlords at the Rejected Store Locations informing the landlords that the Debtor was vacating the premises and surrendering possession of each of the Rejected Store Locations effective as of January 8, 2018 (each a "Surrender Notice").

161.    I believe that the Debtor's decision to reject the Leases is a sound exercise of its business judgment and is in the best interests of its estate and creditors. Rejection of the Leases and closure of the Debtor's stores at each Rejected Store Location is central to the Debtor's effort to return its business to profitability. For each of the Leases, the Debtor carefully reviewed the revenues generated and expenses incurred at the Rejected Store Locations and determined that the stores are unprofitable. The Rejected Store Locations are not necessary to the Debtor's business and are a drain on the Debtor's resources. The Leases are no longer of value to the

4820-1243-5290

estate or its creditors and rejection effective as of the Petition Date will permit the Debtor to avoid paying rent for the Rejected Store Locations, and thereby minimize the Debtor's administrative expense obligations.

162. Based on the foregoing facts and circumstances, the Debtor submits that the rejection of the Leases and the abandonment of any Remaining Property in the manner set forth above is supposed by sound business judgment, and is necessary, prudent and in the best interests of the Debtor, its estate and its creditors.

### L. GOB Sale Motion

163. Through the *Debtor's Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to Assume the Consulting Agreement; (ii) Approving the Sale Guidelines; (iii) Approving the Sale of Store Closure Assets Free and Clear of All Liens, Claims and Encumbrances; (iv) Waiving Compliance with Applicable State Laws and Approving Dispute Resolution Procedures; (v) Approving Procedures to conduct Sales in Additional Closing Stores; and (vi) Granting Related Relief* (the "Sale Motion"), the Debtor seeks entry of interim and final orders: (i) authorizing the Debtor to assume the consulting agreement dated as of January 5, 2018 (as amended, revised, or supplemented from time to time, the "Consulting Agreement") by and among A'GACI, L.L.C. (the "Merchant") and Gordon Brothers Retail Partners, LLC (the "Consultant")[14] (a copy of which is annexed as **Schedule 1** to the proposed Interim Order); (ii) approving the procedures for conducting store closing or similarly themed sales, starting on January 26, 2018, in accordance with the terms of the sale guidelines (the "Sale Guidelines") annexed as **Schedule 2** to the proposed Interim Order; (iii) approving the sale of Store Closure Assets (defined below) free and clear of all liens, claims, and encumbrances (the

---

[14] Unless the Court orders otherwise, a declaration regarding Consultant's disinterestedness in this Chapter 11 Case will be filed prior to the entry of a Final Order.

"Sales"); (iv) waiving compliance with Applicable State Laws (defined below) and approving Dispute Resolution Procedures (defined below); (v) approving procedures to conduct the Sales at any Additional Closing Stores (defined below); and (vi) granting related relief.

*Store Closings*

164. The Debtor has faced a challenging business environment brought on by a shift in consumer preferences away from shopping at brick and mortar stores to online retail channels, hurricanes that impacted its most profitable stores, and difficulties with the implementation of an inventory management system. These factors have left the Debtor with a significant number of stores operating at sub-optimal performance levels.

165. Recognizing the need to right-size their store footprint to align with industry conditions, prior to the Petition Date, the Debtor's management team and advisors, including Berkeley Research Group, LLC ("BRG") and A&G Realty Partners, LLC ("A&G"), conducted analysis of the Debtor's existing store footprint to determine if the Debtor should close stores in connection with its broader financial and operational restructuring initiatives. The Debtor's management team, in the exercise of their sound business judgment and in consultation with their advisors ultimately determined that it is appropriate to initially close and wind down (the "Store Closings") at least 49 underperforming brick and mortar store locations (the "Closing Stores"). The list of Closing Stores is attached to the Consulting Agreement as **Exhibit A**. Further, the Debtor's management team and advisors continue to evaluate whether certain of the Closing Stores should instead remain open and whether additional stores beyond the Closing Stores should be closed. Specifically, the determination of the final number of stores to close will depend on, among other considerations, whether the Debtor is able to negotiate more favorable lease terms and rent reductions for certain stores with its landlords (the "Lease

Negotiations"). The Debtor has retained A&G to assist with the ongoing Lease Negotiations. The Debtor reserves the rights to add or remove stores from that list in the exercise of its reasonable business judgment and depending on the outcome of the Lease Negotiations, subject to entry of the Interim Order or the Final Order, as applicable.

166.    In formulating the list of Closing Stores, the Debtor considered, among other factors, historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance. The Closing Stores are either unprofitable, are significantly underperforming compared to the Debtor's remaining portfolio, or may not be a not a strategic fit with the Debtor's business going forward. Many of the Closing Stores are located in geographic markets that have experienced poor or negative sales trends, and may no longer fit within the Debtor's business plan. As indicated above, in order to maximize the value of its estate, the Debtor may need to close additional stores during this Chapter 11 Case not identified in the Consulting Agreement (such stores, the "Additional Closing Stores," and together with the Closing Stores, the "Stores").

167.    In conjunction with its analysis of store performance, the Debtor also conducted a detailed review and analysis of its inventory levels at the Closing Stores. Such inventory will be included in and sold as part of the Sales (collectively, the "Merchandise"). The Debtor expects that the bulk of the Sales and Store Closings will take approximately five weeks to complete.

168.    After determining that the Consultant was well qualified and negotiating the terms of its agreement at arms' length with the assistance of its advisors, the Debtor selected and engaged the Consultant to manage the Store Closings as well as to sell their furniture, fixtures, and equipment (the "FF&E" and, together with the Merchandise, the "Store

Closure Assets") located in the Closing Stores and otherwise prepare those stores for turnover to the applicable landlords on the terms set forth in the Consulting Agreement.

169.    The Debtor seeks to assume the Consulting Agreement so that the Consultant may continue its preparation for the Store Closings on a postpetition basis without interruption. The Debtor has determined, in an exercise of its business judgment, that (a) the services of the Consultant are necessary for a seamless and efficient large-scale execution of the Store Closings and Sales, as is contemplated by this Motion, and to maximize the value of the assets being sold, and (b) the Consultant is capable of performing the required tasks on favorable financial terms, as determined by the evaluation process.

170.    Further, the Store Closings are a critical component of the Debtor's go-forward business plan, and assumption of the Consulting Agreement will allow the Debtor to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtor's estate. The relief requested in this Motion is integral to maximizing the value of the Debtor's estate. It will permit the Debtor commence the Store Closings in a timely manner as contemplated by this Motion and will establish fair and uniform sale guidelines to assist the Debtor and its creditors through the Debtor's transition to a smaller, more profitable enterprise.

*The Consulting Agreement*

171.    I believe that assumption of the Consulting Agreement will allow the Debtor to utilize the logistical capabilities, experience, and resources of the Consultant in performing large-scale liquidations in a format that allows the Debtor to retain control over the sale process. The consulting agreement was negotiated in good faith and at arms' length. As such, I believe the

Consulting Agreement contains the most favorable terms available under the circumstances. I believe the Consulting Agreement is in the best interest of the Debtor and its estate.

172.     The Consultant has extensive expertise in conducting liquidation sales and can oversee, and assist in the management and implementation of, the Store Closings in an efficient and cost effective manner. Assumption of the Consulting Agreement will enable the Debtor to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closings and Sales for the benefit of all stakeholders. If the Consulting Agreement is not assumed on an interim basis, there could be substantial harm to all stakeholders. For example, the estate would lose the benefit of the momentum and preparation that has already been started by the Consultant regarding the Store Closings prepetition. Finally, given the number of Closing Stores and the particular issues in administering the Store Closings, it is not certain the Debtor could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant, without added delay or cost.

*The Sale Guidelines*

173.     The Debtor seeks approval of streamlined procedures (*i.e.*, the Sale Guidelines) to sell the Store Closure Assets, in each case free and clear of liens, claims and encumbrances. The Debtor also seeks approval of the Sale Guidelines to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtor is conducting the Sales in compliance with applicable law and with the Bankruptcy Court's approval. The Debtor seeks interim approval of the Sale Guidelines in light of the need to start the sales on January 26, 2018, so that the Debtor can complete the Sales prior to the Debtor's emergence from chapter 11.

4820-1243-5290

174.     I believe that ample business justification exists to conduct the Store Closings. Prior to the Petition Date, the Debtor, with the assistance of its advisors, engaged in an extensive review of each of their stores to: (a) identify underperforming stores; (b) consider whether the store's performance can be improved by various initiatives, including through the negotiation of lease concessions with landlords; and (c) determine what stores should be closed promptly to eliminate their ongoing negative impact on the Debtor's financial performance and to improve the Debtor's liquidity. This process has resulted in the Debtor's identification of the Closing Stores.

175.     Further, delay in consummating the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons, chief among them that the Closing Stores fail to currently generate positive cash flow and therefore are a drain on liquidity. Thus, the Debtor will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Stores. Further, the swift and orderly commencement of the Store Closings will allow the Debtor to timely reject the applicable Store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment.

176.     The Debtor has determined, in the exercise of its business judgment and in consultation with its advisors, that the Sale Guidelines will provide the best and most efficient means of selling the Store Closure Assets in order to maximize their value to the estate. The Debtor estimates that consummation of the majority of the Sales and Store Closings will take approximately five weeks to complete.

_Liquidation Sale Laws and Dispute Resolution Procedures_

177.     It is my understanding that certain states in which the Debtor operates stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").

178.     Liquidation Sale Laws may establish licensing, permitting or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings. Such requirements hamper the Debtor's ability to maximize value in selling its inventory.

179.     I believe that authorizing the Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate. The Debtor does not seek a general waiver of all state and local law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Sales. Moreover, the Debtor will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtor and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

*Fast Pay Laws*

180.     It is my understanding that many states in which the Debtor operates have laws and regulations that require the Debtor to pay an employee substantially contemporaneously with

his or her termination (the "<u>Fast Pay Laws</u>" and together with the Liquidation Sale Laws, the "<u>Applicable State Laws</u>").

181.    The nature of the Store Closings contemplated by the GOB Sale Motion will result in a substantial number of employees being terminated during the Store Closings. To be clear, the Debtor intends to pay its terminated employees as expeditiously as possible and under normal payment procedures. However, the Debtor's payroll system will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws. Under ordinary circumstances, the Debtor's payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law. This process requires the Debtor's payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. Given the number of employees who will likely be terminated during the Store Closings, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtor's estates, if not impossible.

182.    To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtor proposes the Sale Guidelines as a way to streamline the administrative burdens on its estate while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings.  As such, the Debtor believes the Sale Guidelines mitigate any concerns that its landlords or governmental agencies may raise with respect to the Store Closings, and therefore, the below requested relief is in compliance with any applicable Liquidation Sale Laws.

*Lease Restrictions*

183.     The Debtor also respectfully requests a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtor from maximizing value for creditors through the Store Closings and Sales. In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtor operates, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions would also hamper the Debtor's ability to maximize value in selling its inventory.

184.     The Debtor also requests that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closings, the Sales or institute any action against the Debtor in any court (other than in the Bankruptcy Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings, the Sales or the advertising and promotion (including through the posting of signs) of the Sales.

*Abandonment of Certain Property*

185.     The Debtor is seeking to sell all FF&E remaining in the Closing Stores. However, the Debtor may determine that the costs associated with holding or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all. In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

186.    The Debtor will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number and credit or debit card number) in any of the Debtor's hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

*Consumer Privacy*

187.    The Debtor will not be selling or releasing personally identifiable information in the course of the Sales. Therefore, appointment of a consumer privacy ombudsman is unnecessary.

188.    I believe that the relief requested in the Sale Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Sale Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing *Declaration of in Support of First Day Pleadings* is true and correct.

Dated: January 9, 2018

By: _Mark Butterbach_

Name: Mark Butterbach
Title: Chief Financial Officer of A'GACI, L.L.C.